IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| James Perrodin )<br>   Plaintiff, )<br>)<br>)<br>vs. )<br>)<br>United States of America )<br>)<br>   Defendant. )<br>_____) | | C.A. No. 2:04-0112-23<br>**FINDINGS OF FACT**<br>**AND**<br>**CONCLUSIONS OF LAW** |

This matter was tried without a jury on February 24, 2005. The court–having heard the arguments, read the briefs of counsel, and considered the evidence including courtroom testimony of witnesses, deposition testimony, and exhibits–enters a judgment in favor of Defendant United States (collectively hereinafter "Government") based on the following findings of fact and conclusions of law.

## BACKGROUND

Plaintiff James Perrodin brings this action for defamation against the Government pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741 *et. seq.* Plaintiff alleges that agents of the Government made defamatory statements about him concerning his discharge as Chief Steward aboard the M/V CAPE EDMONT. Plaintiff seeks damages resulting from these alleged statements.

## FINDINGS OF FACT

1. The Government contracted with Marine Transport Lines ("MTL") and its subsidiary Marine Personnel and Provisioning, Inc. ("MPP") to operate ships owned by the United States Maritime Administration ("MARAD"). MARAD owned several of these ships, known as the "CAPE" ships, which were moored at all relevant times in North Charleston, South Carolina.

2. The primary actions in question occurred aboard the M/V CAPE EDMONT. The CAPE EDMONT is normally maintained in a Reserve Operational Status ("ROS"), which means that while the ship is moored, it must be ready to sail on ninety-six hours notice. While in that status, nine permanent crew members man the ship including several engineers, deck force personnel, and two stewards.

3. The MPP employed the following crew members as officers aboard the M/V CAPE EDMONT: Chief Mate Alexander Schizas, Chief Engineer Frederick MacNeil, First Engineer David Browning, and Second Engineer Michael Purcell. Plaintiff James Perrodin was employed as the Chief Steward aboard the vessel.

4. The MPP and their employees Chief Mate Schizas, Chief Engineer MacNeil, and Second Engineer Purcell acted as agents for the Government aboard the CAPE EDMONT.

5. All of the ROS ships are berthed either alongside or down the pier from one another; thus, crew members interacted on a regular basis. When two such ships were berthed alongside each other, they routinely took turns feeding both ships' crews from one ship's galley. In this case, the CAPE EDMONT and CAPE DUCATO berthed alongside each other and meals were made available on alternate months aboard the two ships.

6. Because of the close proximity of the ships, life aboard the MARAD ships was similar to a small community with crew members sharing common interests. In particular, food quality was a primary concern and crew members had a vested interest in the cleanliness of each ship's galley.

7. Prior to the events in this suit, Chief Engineer MacNeil fielded numerous complaints about food quality and the uncleanliness of Plaintiff's galley. MacNeil counseled Plaintiff about

improving the cleanliness of the galley, and Plaintiff admitted that MacNeil directed him to spend more time cleaning the galley.

8.  On February 7, 2002, before eating a corned beef brisket lunch prepared by Plaintiff, both Chief Engineer MacNeil and Second Engineer Purcell showed no signs of physical illness. After eating Plaintiff's lunch, however, both officers became seriously ill and suffered symptoms such as diarrhea.  MacNeil also suffered from nausea and vomiting.  The officers' illnesses incapacitated them for twelve to twenty-four hours.

9.  While he was sick, MacNeil spoke with Chief Mate Schizas about his condition, explaining that he was very ill and the only thing he had eaten that day was the corned beef prepared by Plaintiff.

10.  As Chief Mate and manager of the vessel during MacNeil's illness, Schizas discussed the matter with senior officials at MTL, explaining to them that he believed Plaintiff's lunch was the cause of MacNeil's illness.  When informed of the events, MTL's managers directed Schizas to fire Plaintiff.

11.  On February 8, 2002, Chief Mate Schizas discharged Plaintiff for cause for failure to follow proper food handling procedures.  As required by union rules, Schizas fired Plaintiff in the presence of a witness, First Engineer Browning.

12.  After relieving Plaintiff of his duties, Schizas inspected the condition of the galley and found it in a "general state of disrepair," in need of cleaning, with food left out, and with remnants of meat remaining on the meat slicer (Schizas Test at 137.)

13.  After being fired, Plaintiff sliced a sample from the corned beef and had his friend, Patricia Rose ("Rose"), refrigerate it immediately.  Plaintiff later shipped the sample to Mr.

Joseph Hubbell ("Hubbell") of Chem-Bac Laboratories, Inc. in Charlotte, North Carolina for testing.

14. While Hubbell did not find evidence of the organisms associated with food poisoning in the sample of corned beef, Hubbell later admitted that he had not tested any of the condiments from the galley on the day in question nor had he tested samples from the galley's utensils or food preparation surfaces.

15. In addition to telling his friend Rose about his discharge, Plaintiff also wrote a letter to his union representative, complaining that his discharge for poor sanitary practices was not legitimate and sent a copy of that letter to the headquarters of MTL.

.     16. As might be expected, there was some evidence of gossip and rumors among the crew members of the CAPE EDMONT and CAPE DUCATO about Plaintiff's firing, but there is no conclusive evidence that agents of the Government published the basis for Plaintiff's discharge.

17. After leaving the CAPE EDMONT, Plaintiff did not seek employment elsewhere. Plaintiff applied for only one job, as a landscaper, after his discharge. Plaintiff stated he did not know why he did not get the job, but did admit that he had never been explicitly denied employment because of his discharge from the CAPE EDMONT.

## CONCLUSIONS OF LAW

1. The elements of the common law tort of defamation are (1) a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Holtzscheiter v. Thompson*

*Newspapers, Inc.* 506 S.E.2d 497, 506 (1998).

2. Regarding falsity, the common law of defamation "overlooks minor inaccuracies and concentrates upon substantial truth . . . . Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)

3. Here, Plaintiff did not establish that agents of the CAPE EDMONT made any false statements. Plaintiff was responsible for the cleanliness and sanitary condition of the galley. Chief Engineer MacNeil and Second Engineer Purcell did not show signs of physical illness before their lunch, and MacNeil ate his sole meal of the day in Plaintiff's galley. After lunch, both officers became seriously ill. Whether they became ill from the meat, condiments, bread, or utensils used to prepare the meal is not relevant. It is clear that any statement made concerning Plaintiff's preparation of the lunch which were made between agents of the CAPE EDMONT and managers of the MTL were justified in the discharge of their duties. The court cannot conclude that statements concerning the probable cause of the officers' illnesses were false.

4. Under South Carolina law, communications for a common interest do not constitute "publication" for purposes of defamation law. *Bell v. Bank of Abbeville*, 38 S.E.2d 641, 642-43 (S.C. 1946). "When one has an interest in the subject matter of a communication, and the person (or persons) to whom it is made has a corresponding interest, every communication honestly made, in order to protect such common interest, is privileged by reason of the occasion." *Swinton Creek Nursery v. Edisto Farm Credit*, 514 S.E.2d 126, 134 (S.C. 1999) (citation omitted).

5.  The court finds that communications between and among Chief Mate Alexander Schizas, Chief Engineer Frederick MacNeil, First Engineer David Browning, and managers of MTL regarding Plaintiff's discharge were protected by a qualified privilege as legitimate communications within company management about personnel actions. These officers all acted in their official capacities in the matters surrounding the discharge. *Bell*, 38 S.E.2d at 643. There can be no liability under the law of defamation for such privileged communications.

6.  In addition, there can be no publication where Plaintiff himself communicates the allegedly defamatory statements to a third party. *Carson v. Southern Railway Co.*, 494 F. Supp. 1104, 1114 (D.S.C. 1979). Plaintiff personally published the core information about his firing to his union representative and to his friend Patricia Rose. There can be no recovery against the Government for these publications or for subsequent publications stemming from them. Because Plaintiff has no viable claim for defamation, judgment must be entered in favor of the Government.

7.  The court is compelled to note Plaintiff's prior years of good and dedicated service, as well as his integrity and firm belief in his cause. While the facts of this case do not permit the Court to make an award to Plaintiff, neither do they prevent the Court from saying thank you for your service.

## CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant United States of America is not liable to Plaintiff for defamation.

**AND IT IS SO ORDERED.**

S/ Patrick Michael Duffy_____  
**PATRICK MICHAEL DUFFY**  
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**April 19, 2005**